# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| KELLY, SUTTER, MOUNT & KENDRICK, P.C. D/B/A KELLY, SUTTER & KENDRICK, P.C. AND J. DOUGLAS SUTTER, §§§§ | |
| Plaintiffs, §§ | |
| VS. § | CIVIL ACTION NO. H-05-2213 |
| ROBERT ALPERT, §§§ | |
| Defendant. § | |

## MEMORANDUM AND ORDER

Plaintiffs Kelly, Sutter, Mount & Kendrick, P.C. d/b/a Kelly, Sutter & Kendrick, P.C., and J. Douglas Sutter (together, "Kelly Sutter") sued their former client, Robert Alpert, alleging that he owed $93,131.37 in unpaid legal fees. (Docket Entry No. 1, ¶ 7). Alpert did not file a timely answer or otherwise appear. Kelly Sutter moved for a default judgment, which this court granted in October 2005. It was not until March 2006, after Kelly Sutter abstracted the judgment and began garnishment proceedings, that Alpert filed a Rule 60(b)(4) motion seeking to set aside the default judgment. Alpert based his Rule 60 motion on the assertion that he had not been properly served with process. (Docket Entry No. 17).[1] Kelly Sutter opposed that motion, asserting that it properly served the summons and complaint by

---

[1] Alpert also filed a motion to quash the writ of garnishment, (Docket Entry No. 18), and a motion for leave to file an original answer to the original complaint, counterclaim, and a complaint against a third-party defendant, (Docket Entry No. 26), which Kelly Sutter opposes, (Docket Entry No. 30).

serving the housekeeper who lived at Alpert's Scottsdale, Arizona residence. (Docket Entry No. 20). Alpert responded that the housekeeper only worked at the house and did not live there, making the service ineffective.

This court held an evidentiary hearing at which the process server, Jeffrey Showen, and Robert Alpert testified. (Docket Entry No. 24). Kelly Sutter also submitted a copy of the videotaped deposition of Alicia Valle Sanchez, the housekeeper who allegedly lived at the Alpert residence when the process was served and who has worked for Alpert for the past six years. Kelly Sutter has moved to amend the default judgment to include additional costs related to the Rule 60(b)(4) proceedings. (Docket Entry No. 25).

After reviewing the motions and responses, the parties' submissions, the pleadings, the applicable law, the witnesses' testimony, and counsels' arguments, this court denies Alpert's Rule 60(b)(4) motion. This court finds and concludes that Alpert was effectively served with process under Rule 4 of the Federal Rules of Civil Procedure. As a result, Alpert's motion to set aside the default judgment, to quash the writ of garnishment, and for leave to file an original answer, are denied, and Kelly Sutter's motion to amend the default judgment is granted. The findings of fact and conclusions of law that are the basis for these decisions are set out below.

## I.   The Evidence as to the Validity of the Service of Process

In his testimony, Robert Alpert described himself as an "investor in various industries." He lives with his wife and young daughter at 9701 East Happy Valley Road, Lot 18, in Scottsdale, Arizona. That residence is where the disputed service of process occurred.

Alpert testified that he has been involved in litigation over the years and, in July 2005, knew what it meant to be served and the obligations that service triggers.

Kelly Sutter was one of the law firms Alpert used to represent him in litigation. A dispute developed between Alpert and Kelly Sutter over the portion of the firm's invoices billed by one lawyer, Douglas Sutter. Alpert refused to pay those fees. After sending Alpert extensive correspondence about the unpaid fees, Kelly Sutter filed this lawsuit on June 28, 2005. On July 8, 2005, Kelly Sutter mailed to Alpert's Arizona address the following documents: a Notice of Lawsuit and Request for Waiver of Service of Summons; two copies of the Waiver of Service of Summons; the Original Complaint; a copy of Order for Conference on October 28, 2005; a copy of court procedures and other information; and Kelly Sutter's disclosure of interested parties.

Alpert and his family spent most of the summer of 2005 either at their summer home in Flagstaff or in Montana. Alpert returned to Scottsdale for a brief period in July 2005 and read his mail. Alpert admits receiving the papers Kelly Sutter mailed to his Arizona home in July 2005 and understanding that he had been sued by Kelly Sutter over the outstanding legal fees. Alpert refused to waive service of process. Based on his understanding that he had no obligation to respond until he had been served, he did nothing further. (Docket Entry No. 17, Ex. 15, unnumbered ¶ 4). Although Alpert testified that he intended to file a malpractice suit against Sutter, he has done nothing to pursue it, including when he received the copy of the lawsuit Kelly Sutter had filed against him to collect the unpaid fees.

On August 4, 2005, Alpert and his family were not at their home in Scottsdale.  The housekeeper and nanny, Alicia Sanchez, was there.  On that date, Jeff Showen, a process server in Phoenix, Arizona, went to Alpert's Scottsdale residence to serve the summons and complaint.  (Docket Entry No. 20, Ex. O).  At 2:58 p.m. local time, he arrived at the gate outside Alpert's home and saw a sign reading, "Alpert."  The gate to the home was open. Showen noted that the trash had been placed outside the unit for pick-up.  Showen observed that the home had a long, straight driveway in front where a blue H-1 Hummer was parked. Showen parked halfway up the driveway, went to the front door, and knocked three times. Showen could see into the house through open blinds and observed a room that looked like an office to the right of the front door.  Showen was walking back to his vehicle when he heard the front door open.  When he went back to the house, a Hispanic woman answered the door.

Showen testified that he greeted the woman and asked her if Robert Alpert was at home.  According to Showen, the woman responded in English; Showen does not speak any Spanish.  The woman told Showen that Alpert was out of town with his family.  Showen asked her name, which he wrote down later that day as "Alicia Balley Sanchez."  (*Id.* at 2). He repeated the name back to her to make sure that he had it right.  Showen then asked if she was living at the house.  Showen testified that he understood the legal requirement that he leave the documents with someone who was a household member, not someone who was merely visiting or working at the house.  According to Showen, Sanchez replied that she was the housekeeper who lived at the house.  This statement is admissible against Alpert as an

4

admission by an agent. *See* FED. R. EVID. 801(d)(2)(D) ("a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is not hearsay).[2]

Showen explained that he was a process server who had some documents for Alpert and asked Sanchez if she could taken them. Showen testified that Sanchez replied that she could take the documents and pointed to the office Showen had seen through the blinds. Showen asked her again if she lived at the residence; she stated that she had lived there and worked as a housekeeper for a number of years. (*Id.*). Showen thanked her and she went back into the house with the documents in her hands and closed the front door.

On his way back to his car, Showen again looked at the vehicle in the driveway. He noted that the car had Texas plates reading, "WYO 227." Showen then drove down the street a short distance, pulled over, and completed a form that is part of the record. The form lists the address and date and time of service. On the "person served" line, Showen wrote, "Alicia Balley Sanchez," which is a phonetic spelling of Alicia Valle Sanchez, the housekeeper's

---

[2] Answering the door and accepting mail and packages for Alpert were part of Sanchez's job duties. Sanchez's answers to the questions Showen asked concerned a matter within the scope of her employment. *See, e.g.*, *Corley v. Burger King Corp.*, 56 F.3d 709, 710 (5th Cir. 1995) (holding that a restaurant employee's statement about going to work at the time of an accident was admissible under FED. R. EVID. 801(d)(2)(D)); *Crawford v. Garnier*, 719 F.2d 1317, 1323–24 (7th Cir. 1983) (statements made about application process by employee whose job required him to collect and process applications were admissible as agent admissions). *See United States v. Richards*, 204 F.3d 177, 202 (5th Cir. 2000) ("The proponent of the evidence must prove the preliminary facts to bring the statement with Rule 801(d)(2)(D), by a preponderance of the evidence."). Sanchez's response to Showen that she lived in the Alpert home is admissible as an agent admission. "Authority to speak is no longer of concern; all that is required [for an agent admission] is that the statement concern a matter within the scope of the agency or employment, and that the agent or servant still be employed at the time of making the statement." *Alba v. Loncar, P.C.*, No. 3:03-CV-1295-M-(BH), 2004 WL 1144052, *4 (N.D. Tex. May 20, 2004) (quoting 30B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 7023(2000)).

name.  (Docket Entry No. 24, Ex. 66).  Showen explained that he wrote her middle name as "Balley" based on the pronunciation.  On the "Relationship/Title" line, he wrote, "Live In Housekeeper."  Showen wrote a physical description of Sanchez, the "Alpert" sign, a description of the car and license plate, and some notes of his conversation with Sanchez, including her statement that she lived in the home "for years as housekeeper."  (*Id.*).

Showen's testimony was consistent with an affidavit he submitted.  In both the affidavit and his live testimony, he testified that Sanchez greeted him in English at the Alpert home, conversed with him in English, and stated that she lived at the house.  He testified that Sanchez told him she would take the documents and place them on Alpert's desk.  Showen testified that he viewed a portion of Sanchez's videotaped deposition and that she was the person who he had met and served at the Alpert home.  Showen denied that Sanchez told him that she did not speak English.  Showen explained that he had spelled Sanchez's name on the form phonetically from the way she pronounced it.  Kelly Sutter's attorneys also introduced evidence that Alpert owned the Hummer parked in the driveway.

Alpert submitted an affidavit and testified in support of his motion to set aside the default judgment.  As noted, he admitted receiving the lawsuit and proposed waiver of service Kelly Sutter sent by mail in July 2005.  (Docket Entry No. 17, Ex. 15, unnumbered ¶ 4).  He then went on vacation with his family for the month of August. He stated in his affidavit that "[w]hen I returned to my house in September of 2005 and saw the copy of the papers that had apparently been left their [sic] by the process server in question, I believed that they were the exact same lawsuit papers that attorney, J. Douglas Sutter, sent to me back

6

in July of 2005.  I didn't realize that these were a new version of the lawsuit papers that had

supposedly been served by the process server." (*Id.*).  Alpert testified that he did not know

of the default judgment until late February 2006, when his attorney informed him. (*Id.* at

unnumbered ¶ 5).  Alpert also stated in his affidavit that "Alicia Valle Sanchez did not live

or reside at [his residence] any time during the month of August 2005.  Alicia Valle Sanchez

only worked at that address part time for my family in August of 2005.  Alicia Valle Sanchez

lived with her fiancee in Phoenix, Arizona from April or May of 2005 to the present date. .

. . The only time I have ever allowed Alicia Valle Sanchez to accept deliveries or documents

is when someone in my family was going to get a package from a local store.  On those

occasions, I would give Alicia Valle Sanchez permission to accept that specific package.  I

did not give Alicia Valle Sanchez permission to accept any delivery of papers or otherwise

during the month of August 2005." (*Id.* at unnumbered ¶¶ 1–2).

Alicia Valle Sanchez also filed an affidavit and was deposed.  In her affidavit, which

Sanchez  admitted in her deposition that Alpert wrote, she stated that she recalled Showen

coming to the house in August of 2005.  (Docket Entry No. 17, Ex. 12, unnumbered ¶ 3).

Her affidavit account of the events reads:

> Early in August of 2005, a man came to the front door of the house
> owned by Robert Alpert. . . . I was working, cleaning up the house at the time.
> All of the people in the Alpert family were gone out-of-town for all of August
> of 2005.  I was the only person who was supposed to be in the Alpert house
> during the month of August, 2005.
>
> In early August of 2005, the man who came to the door of the Alpert
> house asked if Mr. Alpert was home.  I said, "no."  The man started saying
> other things that I did not understand.  I said, "no habla englis."  He gave me

some papers and asked me my name.  I did not know what the papers were.
I put the papers with a pile of newspapers in Mr. Alpert's study.  I never told
Mr. Robert Alpert about the papers because I did not remember about them by
the time he came back to the house in September of 2005.

I speak Spanish very well, but I only speak and understand very little
English.  I have a hearing disability.  I must wear a hearing aid to hear
properly.  I do not wear a hearing aid while I am cleaning in the Alpert house
because the loud vacuum cleaner noise makes the hearing aid buzz.  When the
man came to the house with papers in August of 2005, I did not have my
hearing aid in, so I could not hear him very well.

(*Id.* at unnumbered ¶¶ 2–4).

Sanchez testified that although she lived at the Alpert home for years while working

there as a nanny and housekeeper, in April or May 2005 she moved in with her fiancé.  (*Id.*

at unnumbered ¶ 5).  She concluded the affidavit by stating, "Mr. Robert Alpert helped me

to choose the words that I used in this affidavit.  Even so, every fact and every statement in

this affidavit is true and correct, and I know that they are true and correct from my personal

knowledge."  (*Id.* at unnumbered ¶ 6).  Sanchez submitted affidavits in both Spanish and

English.  (Docket Entry No. 17, Exs. 12–13).

Kelly Sutter deposed Sanchez on April 6, 2006.  The videotaped deposition was

admitted into evidence.  Sanchez testified that she has worked for Alpert since 2000 and that

she lived with the Alperts for "four to five years."  (Docket Entry No. 24, Ex. 67C at 9, 13).

She was hired shortly before the Alpert's daughter was born.  Her duties changed slightly

over time, but included housekeeping, helping watch the child, and taking care of the dog (or

dogs).  Sanchez testified that she could understand some English and speak a little, but her

testimony as to the extent of the Spanish she understood and spoke was neither consistent nor

credible.  On more than one occasion during the deposition, she answered a question in English before the translator interpreted the question into Spanish for her.  (*Id.* at 10, 17).[3] She testified inconsistently that her boyfriend speaks a "little Spanish," but that he speaks to her "mostly in Spanish."  (*Id.* at 8).  Alpert testified that he and his wife speak only a little Spanish, but both Alpert and Sanchez testified that Sanchez could understand when Alpert and his wife gave instructions.  (*Id.* at 58).  Alpert testified that if there were complex instructions, they would use Sanchez's bilingual sister or a Spanish-speaking employee at Alpert's office to translate.

Sanchez was not credible in her testimony that when the process server came to the Alpert home, she told him (in Spanish) that she did not understand any English.  This court credits Showen's testimony that Sanchez was able to understand what he said to her in English and responded to him in English.

Sanchez testified that from shortly after she began working for the Alperts in 2000 until the spring of 2005, she lived in the Alpert home.  She had her own bedroom, bathroom, television, and a household key.  Sanchez testified she would live at the Alpert home during the week and on weekends would leave the home and spend nights with her girlfriends.  (*Id.* at 15).  She testified that sometime in the spring of 2005, she moved to her boyfriend's house.  She did not know the address.  (*Id.* at 46).  She testified that after she moved out, she still had her own bedroom, bathroom, and television at the Alpert house and had her own

---

[3] Sanchez's attorney objected to this "inappropriate characterization" of the events on the record. (*Id.* at 17).  This court viewed the video deposition and agrees that Sanchez did understand some of the questions without translation.

9

key.  Although Sanchez stated that she no longer lived at the Alpert home after April or May of 2005, she testified that she recognized Alpert's address on the deposition subpoena—served in the spring of 2006—because "I was living there." (*Id.* at 24).

Alpert testified that although Sanchez did not live in his Scottsdale house after the spring of 2005, he continued to pay her the same amount of money that he had when she was living and eating there.  There are no documents relating to her wages because she was paid in cash.  Alpert supported his assertion that Sanchez did not live in the Alpert house after the spring of 2005 by his testimony that he had to hire a house/dog sitter when he and his family were out of town.  Alpert testified that the house/dog sitter would stay at the house every afternoon and every night when the family was out of town.  Alpert argued that if Sanchez had been staying in the house, he would not have had to hire someone to spend nights at the house and to take care of the dogs.  Alpert did not bring to the hearing, or later produce, documents to reflect when and how much he paid a house/dog sitter.  He testified at the hearing that he had checks reflecting payment to the house/dog sitter but he had not brought them.  He later clarified that in fact, there were no checks because the house/dog sitter was also paid in cash.

Alpert's testimony as to the house/dog sitter contradicted Sanchez's.  She testified that no one besides herself and family members lived in the Alpert home, stating that she was the only employee who did so.  She testified that there was "a boy" who would stay in the house "over the weekends" when the Alperts were traveling.  (*Id.* at 65).  This testimony does not show that Sanchez was not living in the Alpert house in August 2005.  Sanchez testified that

10

even when she was living at the Alpert house, she did not stay there on weekends; according to Alpert's testimony, a house/dog sitter would have been necessary on weekends if the family was out of town, even when Sanchez was living in the house during the week. Sanchez testified that during the week the dog sitter did not come except "sometimes" to walk the dogs in the afternoon. According to Sanchez, the house/dog sitter only stayed in the Alpert home over the weekends when the Alperts were out of town, not during the week. (*Id.* at 65, 69). Alpert's testimony as to the house/dog sitter does not support the contention that in August 2005, Sanchez was working but not living in the Alpert home during the week.

Neither Alpert nor Sanchez were credible in their testimony that in August 2005, Sanchez worked at the Alpert home but lived with her boyfriend.[4] The credible evidence is that in August 2005, Sanchez worked at the Alpert home and lived there during the week, as she told the process service in response to his questions.

The record also shows that Sanchez's duties included receiving deliveries to the house, gathering packages, papers, and mail delivered to the home, and putting the items addressed to Alpert on his desk. Testimony by Alpert and Sanchez that Alpert only authorized her to accept certain shipments and packages was contradictory and unclear. The

---

[4] At the evidentiary hearing, Alpert also proffered affidavits from Ken McGonagle, Sanchez's boyfriend, and Walter Cerini, who Alpert identified as the house/dog sitter. Both affidavits repeat and support Alpert's version of the facts. Both affidavits are cumulative of the presented testimony. More importantly, Alpert introduced these documents at the end of the evidentiary hearing without notice to Kelly Sutter. The affiants were not made available for deposition or cross-examination at the hearing. The affidavits are unreliable given Sanchez's testimony that Alpert wrote the affidavit that she signed, *see* Docket Entry No. 17, Ex. 12, unnumbered ¶ 6, and the inconsistencies between her affidavit and her deposition testimony. Kelly Sutter's objections, made on the record at the hearing, are sustained: the affidavits are inadmissible hearsay. FED. R. EVID. 801.

weight of the testimony supports a finding that Alpert expected and authorized Sanchez to answer the door and accept deliveries of mail and packages of regular size that did not require cash on delivery. Alpert testified that he had not talked to Sanchez about accepting legal documents before August 2005. The only instruction she had, according to Alpert, was that she should not accept packages that Alpert had not talked to her about. This instruction arose after Sanchez had accepted a very large package that the Alperts had not ordered, which was expensive and inconvenient to return. But Alpert also testified that Sanchez could accept routine Federal Express or UPS deliveries, as long as payment was not required, but otherwise should not accept packages that he had not told her about. Both Sanchez and Alpert testified inconsistently from Sanchez's affidavit, in which she stated that Alpert only allowed her to accept deliveries or packages when someone in the family was "going to get a package from a local store and he tells me to accept that specific package." (Docket Entry No. 17, Ex. 12, unnumbered ¶ 6). The credible testimony is that before August 2005, Alpert had not provided any specific instructions to Sanchez on accepting documents that were hand-delivered.

When asked about the process server's visit to the Alpert home on August 4, 2005, Sanchez recalled Showen coming to the house. (Docket Entry No. 24, Ex. 67C at 39). She testified that the process server asked her to place the documents in Alpert's office, (*id.*), but later clarified that "when he mentioned that the documents were for Mr. Alpert, I assume that he was asking me to put them in his office." (*Id.* at 40). Sanchez stated that "[o]nly when [Alpert] tells me that he's expecting something, a package or something, he'll tell me receive

12

it and put it in my office.  Otherwise, I have no authority to receive it." (*Id.* at 41).  Sanchez conceded, however, that "[s]ometimes, [she will] receive" a package that he has not told her about in advance and "place it in his office." (*Id.*).  Sanchez testified that she received the documents from the process server and put them on Alpert's desk, with other mail and newspapers.  (*Id.* at 42–43).

In March 2006, when another process server came to the Alpert home to deliver the subpoena for Sanchez to appear for her deposition, Sanchez again took the papers and put them on Alpert's desk.  (*Id.* at 21).  Sanchez explained that "when Mr. Alpert came [sic] back, he looks at his papers on his desk.  I always place the newspapers and whatever else I place there." (*Id.* at 22).  She later explained that when documents came she "would place [them] in Mr. Alpert's office, and if it was intended for Mrs. Alpert, then I would place [the document] in the kitchen." (*Id.* at 40).  She reiterated this point later in the deposition: "When it's mail [that arrives], I put it in the kitchen, but if it's boxes and it's addressed to Mr. Robert Alpert, I'll put it in his office. . . . when I go in and pick up the mail [which she does when Mrs. Alpert is not home] and if there's a box with a name on it, Mr. Robert Alpert, I'll bring it back to the house, and if it's addressed to Mrs. Hillary Alpert, I'll place it in the kitchen." (*Id.* at 70).  Sanchez testified that, "whatever it is, if it's addressed to Mr. Alpert, I'll put it in his office or in another location." (*Id.* at 70–71).

Alpert also contends that Sanchez lacked "suitable age and discretion" to accept service of process.  *See* FED. R. CIV. P. 4(e)(2).  His testimony, and Sanchez's, are inconsistent with this contention.  Alpert testified that Sanchez performs a wide variety of

13

tasks for his household, from cleaning to watching his young daughter to taking care of the house and dogs when the family is absent.  Although she is not fluent in English, that does not mean she lacks the discretion Rule 4 requires.  As one court has noted, "Defendant has not explained why a person cannot be wise and prudent in a foreign language.  Even minimal understanding of the English language should be sufficient for a showing of suitable discretion, if the individual can comprehend the circumstances of service."  *Boston Safe Deposit and Trust Co. v. Morse*, 779 F. Supp. 347, 350 (S.D.N.Y. 1991).  Alpert's claim that Sanchez lacked "suitable age and discretion" to receive service because she is hard of hearing is also unavailing.  She testified that on August 4, 2005, she was vacuuming and not wearing her hearing aid.  Yet she was able to discern Showen's presence over the noise of the vacuum cleaner and, according to Showen's credible testimony, talk with him.  Indeed, her own affidavit states that when she answered the door, she was able to understand his first question—whether Alpert was at home—and respond negatively.  Sanchez is an adult whom the Alpert family trusted with a key to their home, her own bedroom and bathroom in their home, and the care of the house, pets, and responsibility for watching their daughter.  The credible evidence shows that she had "suitable age and discretion" to accept the papers Showen delivered.

Alpert testified that he recalled receiving the waiver of service of process for this lawsuit from Kelly Sutter in July 2005.  He testified that he knew Kelly Sutter had sued him in this court; he also had unrelated ongoing litigation in this court.  He also stated that when he returned home in September of 2005, he saw the summons and lawsuit that Sanchez had

14

accepted in August and placed on his desk, but he thought that they were the same papers that Kelly Sutter had mailed in July.  After the April 2006 hearing, Alpert reported that he still had the materials received by mail in July 2005, but could not find the original of the summons and complaint that Sanchez had accepted from the process server in August 2005.

Alpert testified that he was a sophisticated businessman familiar with litigation.  He testified that he was generally aware of the meaning of being "served" in a lawsuit and that he had retained attorneys in this district and in Phoenix at the time of the attempted service.  He did not respond to this lawsuit because he received the summons and complaint in July 2005 by mail and did not waive service.  He testified that although he saw the August 2005 summons and complaint, he did not realize that it had been served and accepted by his housekeeper, but instead believed that the papers were simply another copy of the July 2005 mailing.[5]  Given Alpert's sophistication about, and experience in, litigation, his testimony that he unquestioningly believed that the legal documents on his desk in August 2005, that were clearly not delivered by mail, were simply another copy of what he had received by mail in July 2005, or the same set of documents he had been mailed in July 2005, is not credible.

## II.      The Legal Standards

---

[5]  At the evidentiary hearing, Alpert claimed that he had copies of these documents and would produce them. He failed to do so. (*See* Docket Entry No. 31). Kelly Sutter has filed a motion requesting this court view this nonproduction as an adverse inference against Alpert under the doctrine of spoliation, arguing that if Alpert had produced the documents, his argument would be further undermined because the set of documents served on Sanchez would look different from the set sent to Alpert.  (*Id.*).  In light of the difference in delivery methods (postal mail versus hand delivery), a spoliation instruction is unnecessary. In light of this court's ruling on Alpert's Rule 60(b)(4) motion, this motion is denied as moot.

"A rule 60(b)(4) motion allows a party to receive relief from a final judgment, order, or proceeding if the underlying judgment is void." *Goetz v. Synthesys Techs., Inc.*, 415 F.3d 481, 483 (5th Cir. 2005). Rule 60(b) states in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . . (3) fraud . . . misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged . . . . or (6) any other reason justifying relief from operation of the judgment . . . .

FED. R. CIV. P. 60(b). "Most circuits have interpreted Rule 60(b) quite narrowly, affording relief from final judgments only in the most specific circumstances." *Carter v. Fenner*, 136 F.3d 1000, 1005 (5th Cir. 1998); *see also Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204, 208 (5th Cir. 2003) ("We have recognized two circumstances in which a judgment may be set aside under Rule 60(b)(4): 1) if the initial court lacked subject matter or personal jurisdiction; and 2) if the district court acted in a manner inconsistent with due process of law.") (citing *Carter*, 136 F.3d at 1006; *Jackson v. FIE Corp.*, 302 F.3d 515, 521–22 (5th Cir. 2002)). "Rule 60(b)(4) motions have no set time limit; in this circuit, they need not even be made within a 'reasonable time.' " *Callon Petroleum Co.*, 351 F.3d at 208 n.3 (citing *Carter*, 136 F.3d at 1006; *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 142–43 (5th Cir. 1996)).

"Federal courts generally disfavor default judgments, preferring to resolve disputes according to their merits." *Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 393 (5th Cir. 2001) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 892 (5th Cir. 1998); *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981)). A district court must set aside

16

a default judgment if it determines that it lacked personal jurisdiction over the defendant because of defective service of process. *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1998); *Recreational Props., Inc. v. Sw. Mortgage Serv. Corp.*, 804 F.2d 311, 314 (5th Cir. 1986).  The issue in this case is whether Kelly Sutter properly served Alpert.

Federal Rule of Civil Procedure 4 establishes the requirements for properly serving a defendant.  Rule 4(e)(2) outlines the method for effecting service on an individual:

> by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

FED. R. CIV. P. 4(e)(2).  The Fifth Circuit has held that this provision (formerly Rule 4(d)(1)) "should be broadly construed where the defendant . . . received notice of the suit." *Nowell v. Nowell*, 384 F.2d 951, 953 (5th Cir. 1967).  Other courts follow the same approach. *See Painewebber, Inc. v. Capra*, 865 F.2d 264, No. 87-15032, 1988 WL 141382, at *1 (9th Cir. 1988) (unpublished) ("Rule 4 is a flexible rule that should be liberally construed so long as the defendant receives notice of the complaint.") (citing *Direct Mail Specialist v. Eclat Computerized Techs.*, 840 F.2d 685, 688 (9th Cir. 1988)); *Precision Etchings & Findings, Inc. v. LGP GEM, Ltd.*, 152 F.R.D. 433, 435–36 (D.R.I. 1993) (surveying cases and concluding that once a court has determined that the defendant received actual notice of the suit, Rule 4(d)(1) should be "broadly interpreted") (citing and discussing *Nowell*, *supra*, *United States v. Ayer*, 857 F.2d 881 (1st Cir. 1988); *Lavey v. Lavey*, 551 A.2d 692 (R.I.

17

1988); *Plushner v. Mills*, 429 A.2d 444 (R.I. 1981)); *Hartford Fire Ins. Co. v. Perinovic*, 152 F.R.D. 128, 131 (N.D. Ill. 1993); *see also* 4A Charles A. Wright & Arthur A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1096, at 78–80 (1987) (arguing against an overly technical construction of Rule 4 if the defendant has actual notice).

There is no dispute that Kelly Sutter left the appropriate documents at Alpert's Arizona residence and that Alpert had notice of this lawsuit. The critical issues are whether Alpert's housekeeper "resided" in Alpert's home on August 4, 2005 and whether she was of "suitable age and discretion" to accept service of process.

Various courts have addressed whether individuals who work for a defendant with respect to the defendant's home "reside" in that home for the purpose of Rule 4. In *Nowell*, the Fifth Circuit held that a resident apartment manager "resided" in the defendant's dwelling place as intended in Rule 4. The apartment manager lived in the same sixty-three unit apartment complex as the defendant, although she actually resided in a unit across an alley from the defendant that had a different street and mailing address. *Nowell*, 384 F.2d at 952. Despite the fact that the apartment manager had not met the defendant at the time of service; that the only contact between the defendant and the apartment manager was that the defendant paid the manager his monthly rent; and that they resided in different buildings, the Fifth Circuit held that service on the defendant by leaving process with the apartment manager was sufficient. *Id.*; *accord Smith v. Kincaid*, 249 F.2d 243, 245 (6th Cir. 1957) (holding that service on the defendant's landlady was sufficient without a showing that the landlady ever delivered the summons and complaint to the defendant). Courts have similarly

18

held that apartment doormen "reside" in the defendant's dwelling house or usual place of abode as understood in Rule 4.  *See Perinovic*, 152 F.R.D. at 131 (holding that a doorman who was authorized to accept packages, letters, and deliveries for tenants in the building could accept service of process for a tenant); *Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F. Supp. 1033, 1051 (S.D.N.Y. 1993) (holding that service  on a twenty-year-old doorman was sufficient to satisfy Rule 4's requirements); *see also Braun v. St. Vincent's Hosp.*, 442 N.E.2d 1274, 1274 (N.Y. 1982) (service on doorman came within the contemplation of New York's rules of service, which, like FED. R. CIV. P. 4, require service upon "a person of suitable age and discretion" at the defendant's "actual dwelling place"); *F.I. duPont, Glore Forgan & Co. v. Chen*, 364 N.E.2d 1115, 1274 (N.Y. 1977) (same).

Courts have also considered whether a housekeeper can accept service of process for the homeowner-defendant.  Courts distinguish between live-in housekeepers, who can validly accept process, and non-live-in housekeepers, who generally cannot.  In *Franklin America, Inc. v. Franklin Cast Products, Inc.*, 94 F.R.D. 645 (E.D. Mich. 1982), the court summarized the case law, stating:  "The term 'residing therein' has been broadly and naturally interpreted to apply to a landlord, an apartment manager, a housemaid whose usual place of residence was the defendant's home, and a live-in maid.  On the other hand, the term 'residing therein' has been held not to encompass a janitor or a ranch employee."  *Id.* at 647 (internal citations omitted).  Concluding that "the common theme in the cases is not only whether the defendant is reasonably likely to receive the papers served, but whether the person to whom they are handed is a full-time resident of the defendant's dwelling house or usual place of abode," the

19

court determined that the defendant's part-time, non-resident housekeeper was not "residing" in the defendant's house and the plaintiff failed to comply with Rule 4 in serving the housekeeper. *Id.* (citing 4 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1096 at 368–69 (" 'Residing therein' has long been held to require the recipient of the papers to be actually living in the same place as the defendant. Thus, service on an employee of defendant who spends only part of his time at defendant's residence is defective."); *Polo Fashions, Inc. v. B. Bowman & Co.*, 102 F.R.D. 905, 908 (S.D.N.Y. 1984) (holding that service on a part-time, non-resident housekeeper was insufficient); *Reynolds Corp. v. Nat'l Operator Srvs., Inc.,* 208 F.R.D. 50, 54 (W.D.N.Y. 2002) (applying California law, which requires service upon "a competent member of the household," and holding that service of process on a live-in housekeeper was sufficient) *with Barclays Bank of N.Y. v. Goldman*, 517 F. Supp. 403, 413 (S.D.N.Y. 1981) (holding that service on a maid who "was residing" at the home is sufficient).

## III.    Findings of Fact

Based on the testimony from Jeff Showen, Robert Alpert, and Alicia Sanchez, as well as the other exhibits the parties submitted,  this court makes the following factual findings:[6]

1.    Jeff Showen credibly testified that he served Alicia Sanchez on August 4, 2005, that she spoke and understood English, and that she stated that she resided in the home and worked as Alpert's housekeeper.

---

[6]  To the extent that any of the findings of fact is a conclusion of law, it should be considered as a conclusion of law.  To the extent any of the conclusions of law is a finding of fact, it should be considered as a finding of fact.

2.      Alpert's testimony that Alicia Sanchez was not living at his house on August 4, 2005 was not credible.

3.      Alicia Sanchez's testimony that she was not living in the Alpert's home on August 4, 2005 was not credible.  The credible evidence is that during the week, she was working and living at the Alpert home.

4.      On August 4, 2005, Alicia Sanchez was working and residing in the Alpert home  as a housekeeper when she accepted service from Showen and told Showen that she lived in the house.

5.      Alicia Sanchez was of "suitable age and discretion" to accept service of process for Alpert.  Sanchez's duties included responsibilities that signify the required discretion, including child-care responsibilities and care for the home when she was there and the family was away.  Although she does not speak fluent English, she understood a great deal and spoke enough English to communicate with her employers on a day to day basis as well as with the process server.  She accepted the documents from the process server and put them in the usual place Alpert expected her to leave mail and items addressed to him and delivered in his absence, his desk in his home office.

6.      Sanchez acted within the scope of her authority when she accepted service on Alpert's behalf.  Sanchez had authority to answer the door and accept these legal papers, which did not require her signature, any payment of funds, and did not arrive as a large, unannounced package but rather as hand-delivered papers.

6.      Alpert had actual notice of this lawsuit in July of 2005.  In September 2005, he saw the summons and complaint that had been served in August 2005.  He made no inquiry into those papers or into the status of the lawsuit, despite the fact that over a month earlier, he had received a copy of the complaint and related papers by mail. Alpert did not make any effort to seek relief from the default judgment entered in October 2005 until March 2006, in response to collection efforts.

## IV.      Conclusions of Law

Alicia Sanchez was residing in Alpert's home on August 4, 2005 when she received the summons and copy of the complaint from the process server, Jeff Showen, told Showen that she lived at the house, and placed the documents on Alpert's desk.

Alicia Sanchez was of suitable age and discretion to accept service of process on Alpert's behalf.

Service of process on August 4, 2005 was effective under Rule 4 of the Federal Rules of Civil Procedure.

Alpert had actual notice of the lawsuit in July of 2005 and of the summons and complaint that Sanchez accepted and placed on his desk in September 2005.

Because service of process was effective in August 2005, there is no basis for relief under Rule 60(b)(4).

## V.      Conclusion

Kelly Sutter's service on Alpert's live-in housekeeper complied with Federal Rule 4. The record does not support a finding of jurisdictional defect.  The default judgment entered

22

in Kelly Sutter's favor was valid and Alpert's Rule 60(b)(4) motion is denied.  Kelly Sutter's

motion for an amended default judgment, which includes a request for additional, reasonable

costs related to the Rule 60(b) motion, is granted.  Alpert's motions to quash and for leave

to file an original answer, counterclaim, and third-party complaint are denied.

      SIGNED on July 25, 2006, at Houston, Texas.

                                      Lee H. Rosenthal
                           United States District Judge

23